Thank you, Your Honor. Good afternoon. May it please the Court, Counsel. My name is Jason Holden. I represent the defendant appellant, Ms. Yulee Natalie Whitehorn. And before we go forward, let me just make sure. Is Counsel, I guess it's Ms. Soot, are you hearing us appropriately? Are we fine? I am hearing you just fine, Your Honors. Okay. Please go ahead now. If I may reserve two minutes for rebuttal. Ms. Whitehorn has raised three issues on appeal, all directly related to whether or not the search of a closed container located in an inside pocket of her purse exceeded the scope of her consent. The district court's factual findings holding that the government presented clear and positive testimony that the scope of her consent was not exceeded smell like a dead fish that's been five weeks old outside of a refrigerator. And that's the quote from Haseby Woodford, Your Honor. And those factual findings should be reversed. Consideration of the complete factual record that was placed before the district court should leave this court convinced that the express object of the search was limited to stolen artwork and that Ms. Whitehorn's consent was exceeded. The relevant facts of this case begin on June 20, 2002, when three Great Falls officers decided to conduct a knock and talk on Ms. Whitehorn's hotel rooms. Prior to conducting this knock and talk, it is uncontroverted that all three officers knew that a search warrant could not be obtained. Officer Eric Bauman is the only officer that spoke directly with Ms. Whitehorn when the door to room 293 was opened. Along with him was Detective Brian Black of the Great Falls City Police Department and Sergeant Dan Calm, a narcotics officer with the Cascade County Sheriff's Office. The factual findings in this case are clearly erroneous because, unlike a typical criminal case, Officer Eric Bauman testified one day after the search in this case through affidavit testimony to the 8th Judicial District Court in Cascade County, Great Falls, Montana. And this is the relevant testimony that he gave. We request that consent to search the defendant's room for stolen artwork. Defendant granted consent. Some of the artwork in question included small bronzes capable of fitting in small places. The report that he also completed on that date goes on to explain the small bronzes, and he specifically identifies them. He states in his report, it should be noted that some of the stolen artwork is very small and very capable of fitting into Whitehorn's purse. One of the items is a 4-inch bronze of a horse. It is uncontradicted that the testimony in the State Court. Yes, Your Honor. Yes, Your Honor. And for the testimony in the federal court. And I'll get to that. After I filed my brief, after this was ready for hearing, Officer Eric Bauman testified in federal court in front of Judge Haddon that he didn't actually say stolen artwork. What he said was stolen property that included artwork. For the first time after I put the factual findings in my brief to get a hearing and had his uncontradicted testimony in affidavit form, he changed his testimony. And the difficulty there is that this is unlike a typical case where you're trying to impeach an officer with a report. This phrase, stolen artwork, was actually in an affidavit that he testified to under oath. And to reject that testimony and find that the express object of the search was not limited to stolen artwork is clearly erroneous. Well, what kind of property might he have meant when he said stolen property including stolen artwork? I think you have to look to his report for that, Your Honor. And he specifically identifies the 4-inch bronze of a horse. Is that an example of the kind of stolen property? It is an example of the kind of stolen property. It was an example that he referred to. An example that he referred to. We've all been in art museums. There are carved, precious stones that are the size of a corner. Your Honor, this case began as a series of art thefts around Great Falls, Montana. And the focus of the investigation was on stolen art. Large bronzes, large silverware. Statues. And by the time that they came to identify Ms. Whitehorn as a suspect, there is nothing in Officer Baumann's sworn affidavit testimony or his report that would identify a stolen piece of property that would fit into the mini M&M containers that were located in the inside pocket of Ms. Whitehorn's purse. And I would refer the Court to the excerpts of record, page 75. On that page are pictures of the mini M&M containers. These containers are very small. The only thing that you could argue in this case, which the government has argued, is that you could fit jewelry into these items, into the mini M&M containers. If there's any evidence whatsoever that the officers were ever looking for jewelry and that that was included within the other property notion, if we accept that later testimony? Let me answer that question two ways, Your Honor. Ms. Whitehorn's contention is that based on the affidavit testimony and the written reports, there is no basis to find that jewelry was included as a part of that stolen property. Now, of course, Officer Baumann testified at the Motion to Suppress hearing that there was stolen jewelry as well and that that could have fit into the mini M&M container. But, of course, that contradicts his earlier testimony, specifically identifying this bronze statue of a horse. Well, do we know, in fact, that there was stolen jewelry at issue here? There was stolen jewelry at issue in the overall scheme of this art theft ring, Your Honor. But that is not what, at the time on June 20th, 2002, I do not think that the district court had facts before it showing that jewelry was a part of this investigation. And the reason I state that, Your Honor, is Officer Baumann testified on June 21st, one day after the search, and nowhere in his reports or his affidavits does he ever identify stolen jewelry. Well, the question, and I mean, I'm coming back to this. The real question is not necessarily what Officer Baumann had in his head. The question is, what did she consent to? And what does she have in her head when she says you may search? So if he says stolen artwork, she may be consents to that. If he says stolen artwork and other property, now, does the other property mean non-artwork? What are we talking about with respect to other property? That's correct, Your Honor. And when we're talking about other property, the facts of this case indicate that there was a telescope in room 293, which is the first room that the officers entered. And that telescope was picked up, they looked at it, and it's a larger telescope, one that wouldn't fit any methamphetamine or drugs within it. And the officers picked that telescope up. They said, well, is this stolen? And Officer Baumann admitted on cross-examination at the motion to suppress hearing that Ms. Whitehorn said no, it wasn't stolen, and that she had purchased it at Pier 1 Imports. But I want to focus on the purse and the search of the container located in the inside pocket. The subjective intentions of the officer do not control. An officer or, I'm sorry, Sergeant Com, a narcotics officer with the Cascade County Sheriff's Office, admitted that when he looked in that inside pocket and in that closed container, he was looking for drugs. If there's one fact that is absolutely uncontradicted, narcotics or drugs, the words, were never used. And Sergeant Com's, you know, subjective intent clearly reflects that he was looking for drugs. There's a reasonable interpretation of the words, the later words, that the motion to suppress, if we take them at face value, stolen property including artworks, or property including stolen artworks. I'm not sure which way it goes. Are we to interpret that that has to have been stolen property? Yes, Your Honor. I think it does in this case, given the unique facts of this case. And is there any indication that this warrant or the consent included, I give you consent to look for drugs? Absolutely not. In fact, the district court found in Detective Brian Black admitted on cross-examination that when Ms. Whitehorn said they could search, she said, don't mess anything up. Well, that's different from whether you're allowing them to search for it. What's that? Saying don't mess anything up is different from telling us what she's allowing them to search for. I agree, Your Honor. But in United States v. Cannon, this Court recognized that an individual's objection or lack of objection to a search may indicate whether or not that search was within the scope of consent. The uncontradicted facts of this case indicate that when Ms. Whitehorn and her husband were moved to Room 291 and Sergeant Kahn conducted the search of the person in Room 293, which was hidden under a bed, and opened that inside pocket, and Officer Baumann confronted her with that search, she became irate, was flush in the face. I should go back and make sure to focus on this, but you can give me a start at it. And as the testimony, when I opened up the little mini M&M container, I was looking for drugs. Is that uncontradicted? It is, Your Honor. And he admitted that on cross-examination. And that's cited directly in my brief. He says, I was looking in it for drugs as well. As well? As well. Well, but, I mean, he was looking in it for stolen property. But the question is, was he looking in it for drugs? And all of the cases in this circuit that deal with consent, and my time is running out. No, keep going. All the cases that deal with consent searches in this circuit have always began with narcotics or weapons. The one case cited by the government, the officer said, can I search for weapons and narcotics? Why don't we stop you now, and we'll give you a minute in rebuttal. Thank you, Your Honor. And we'll hear from the government. Good afternoon, Your Honors. My name is Lori Sook, and I'm an assistant United States attorney in Great Falls, Montana. Now, we can see and hear you. Can you see us or just hear us? I can see you, Your Honor, but let me tell you what's going on so that you can see my eyes. I will be, when I look down, it's because that's how I can see you, is on a screen down below me. Okay. When I'm looking up at the camera, I want you to be able to see my face. So if you see me do this, it's because I'm looking at your face. Okay. We'll make do with the technology. This seems to be working just fine. Okay. Thank you, Your Honor. Because the objective reasonableness of the conversation governs, we have to put in context what happened when officers Bauman and Black and Deputy Sheriff Calm came to the door and spoke with Ms. Whitehorn. The first thing that happened is they told her that they were there investigating stolen property regarding a related case and gave her a name, Sherry Frazier. And this has meaning because that was a highly publicized case in the papers. It was throughout Great Falls. And Ms. Whitehorn acknowledged that she knew about that case. And what had been – I think she not only knew about the case, she knew Sherry Frazier. And that's the next comment I was going to make. She knew Sherry Frazier. They had gone antiquing together. And the context of that investigation was a series of art and stolen property investigations around Great Falls. It included bronzes, pieces of art, miniatures such as you would find in a Hallmark card store collections like that, as well as jewels. I don't understand what you mean by miniatures. For example, I'm trying to think of some – like Swarovski crystal figurines that are a couple of inches tall. How wide? Statues, those types of things. No, I asked how – you said a couple of inches tall. How wide? I would be guessing, Aaron, but the figurines are probably about a half inch wide. Are there any pictures of those or any specific reference to those in the record? Just simply the description that was given in the paperwork of the affidavits as well as this conversation with – that the agents had about this investigation and what had been publicized about it. And where are those specific small figurines mentioned in the record in front of us? I'm familiar with the reference to the bronze horse of four inches, but these are now much smaller. No, it's not specifically referenced. Where it's referenced is in this discussion that Officer Baumann had with Ms. Whitehorn and what the scope of that investigation was. Now, you said specifically referenced. He didn't mention these tiny figurines or did he? No, what he did is he said, we are here investigating the stolen property and artwork that we – do you know Sherry Frazier? Are you familiar with that investigation? We have heard that you were trading drugs for stolen property, and we would like to talk to you and have consent to search the room. Now, what new knowledge do we have, if any, that lets us know what Ms. Whitehorn has in her head when she hears the phrase stolen artwork and other stolen property, whatever that phrase was? The two things that I think we can look to is specifically this acknowledgement of being familiar with this investigation and what that investigation entailed. And then later on, during the search of the rooms, they looked into a box about the size of a bar of soap, and in there was a telescope, and it's not a big telescope that you'd look at the sky. It's one – the best way I can describe it is the one that would pull out and a pirate would put up to his eye. And that box was opened in front of her, and she did not make any claims such as, I didn't give you permission to look into that box. So in terms of judging what she knew, and in particular in this case, the issue is size, she had no expression of, I didn't give you permission to look into that container or anything of that nature. So we have the description given by Officer Bauman and the testimony also by Officers Black and Sergeant Calm, who were standing there listening to the conversation that said, Officer Bauman said something like this, stolen property to include artwork. That was Sergeant Calm's testimony. Officer Black's testimony was stolen property. So that's what we have to know what she objectively believed was the scope of the search. In this case, it's the government's position that Ms. Whitehorn did not put any limits on the scope of the search, and that although Sergeant Calm clearly under cross-examination said, certainly I was looking for drugs as well, they had told her right at the outset, we have heard that you were trading drugs for stolen property. Can I ask you this about artwork? If somebody says, I'm looking for stolen artwork, and that's the only thing they say to me, and I don't otherwise have a context in which to put it, I don't know, for example, that there's been a theft from a museum dealing with miniatures, they just say stolen artwork. I have to say that my initial response is, I'm thinking of pictures, I'm thinking of sculptures, I'm not thinking of things that can be put into one of these little miniature M&M cylinders that's pretty small. What is it that you say tells us that we should move away from that, I think, common assumption, if it's sort of unelaborated, I'm looking for property and artwork, that tells us that she also thought she was giving them permission to look for tiny things? Well, again, Your Honor, I would go back to the fact that she didn't raise any dissension to them opening this box that was about the size of a bar of soap, and then the telescope was about the size of a marks-a-lot. She raised no objection to that. And does that, are we then to interpret her permission in light, not just of what she initially said yes to, but also to what she did not object to? Absolutely, Your Honor, because the argument proffered by Ms. Whitehorn is that you can take her objection to the fact that when they found drugs in her purse and she objected and said, I didn't give you permission to search, that as evidence that she didn't consent to them opening her purse. But what happens if someone is doing something that I don't object to overtly? Does anything the officer does that I do not object to overtly, does that mean I've consented to the officer doing it? No, Your Honor, but the issue in this case is size, and that's what she's raised. She said she limited the scope of her consent in terms of size, and that what her, what she believed that she consented to couldn't fit into these M&M containers. So when you're trying to judge what she understood, her actions certainly are, give the court evidence of what she understood. But my question is a slightly different one, and that is, let's assume that in fact she saw them open the small box. She had not initially thought that she'd consented to opening something so small. She still, in fact, did not consent to issuing something, to have them open into a small box. She decides for one reason or another, you know, I don't want to make any trouble. I didn't actually consent. I also know that there's just a telescope in there, and so I'm not going to object, but that's not what I consented to. Why is that line of reasoning that you're saying allow you to conclude that, well, she didn't consent instead of she just didn't object? Well, Your Honor, I think because it walks hand in hand with what the government believes she actually did consent to, which was in this case a search for stolen property, including artwork, which included items that would fit into any of these containers. And it just fleshes out the fact that that's actually what she did consent to. And so although I do agree, Your Honor, in some circumstances, that certainly isn't going to be evidence of her initial consent, in this case it just informs us because she didn't object to that. And it's important to note that initially, although the defense counsel is absolutely correct, in the written paperwork of Officer Baumann at the affidavit, he wrote stolen artwork. His testimony at the hearing was stolen property, including artwork, and importantly, the two officers who were standing there listening to the conversation, they heard stolen property, one of them, and the other one heard stolen property, including artwork. And finally, the other point the government would like to make is that Sergeant Kahn testified drugs as well, but it's important to note he said he was looking for jewelry and receipts for storage units as well as drugs. Does a receipt for a storage unit constitute property within the meaning of what she consented to? It is that they had information that the stolen property was in storage units, and that is the reason... Your Honor, that's not my question. If she's consented to searching for property, is searching for a receipt property within the meaning of that which she consented to? No, Your Honor, it wouldn't be, but you could... If that's right, then the fact that he was searching for a receipt doesn't do him any good. But jewelry would fall into the category, Your Honor. And that's what he said that he was looking for. And if he was, if in fact this search did not exceed the scope of his consent, those things that he was able to view that he knew were contraband, such as the drugs, and in this case because he was informed by the investigation, the storage receipts had some meaning to him. What evidence, if any, do we have that there was stolen jewelry in this case? The only evidence we have is that initial comment of Officer Bowman that they were there investigating a branch of the Sherry Frazier investigation. And... So, let me try this and put words in your mouth, but you can take them right back out again. I think I heard you say that we have no specific evidence that there was any stolen jewelry in this case. Is that right? No, Your Honor. We did have stolen jewelry in the case. What evidence in the record do we have of that fact? You don't. What you have is his description of the Sherry Frazier investigation, and that did include stolen jewelry. But he did not specifically... Excuse me. You're saying, and that did include stolen jewelry. It did. I'm asking you, is there anything in the record that tells us that it included stolen jewelry? Because I think I'm confined to the record, as are you. No, Your Honor. He didn't specifically say to her stolen jewelry. He said stolen property. No, I understand that. But that's... I don't think you lose just because he didn't say to her stolen jewelry. I'm asking something different. Do we have in the record any knowledge that, in fact, jewelry had been stolen in this Sherry Frazier case? I don't believe so, Your Honor. If I am wrong, I will supplement with a reference to the record by letter. But I don't believe so, Your Honor, from my memory now. Okay. Thank you. Can you also help me out in understanding these figurines? What evidence do we have about these small figurines? Where is that in the record? In the affidavit... Where is that in the record? I will look for it. But the word miniatures was used in the affidavit, I believe. And that's what I'm talking about when I'm talking about these figurines. Now, miniatures, all we know is miniatures? That's the term I believe was used. But then I got a description of figurines that might have been, you know, two inches tall and a half an inch across. Where does that come from? That's not in the record, Your Honor. That's just the investigation and what was gleaned from the investigation. Gleaned by whom? By the officers in the Sherry Frazier investigation. But did they ever testify to figurines that are that small? They testified, yes, that they were looking for all the property that was involved in the Sherry Frazier investigation. I don't believe they gave the specifics of the dimensions I've described to you. So where did those dimensions just come from? That's my knowledge of what the Sherry Frazier investigation entailed. And when they said – But there's nothing in the record that tells us those things? Just that she was familiar with the Sherry Frazier investigation that had been highly publicized. I know, but I'm asking a different and more narrow question, and that is what do we know in the record about figurines and their dimensions? Anything? Aside from the four and a half inch bronze, we don't. So these figurines that are two and a half, two inches tall and a half inch wide, they're not in the record anywhere? No, we didn't put – So as far as we've got any evidence of small or miniature things that are artworks, it's the four inch bronze horse? Four inch bronze, I believe, yes. Okay. So we have no specific mention in the record of jewelry. We have no specific mention in the record of miniatures two inches tall by half an inch across. The smallest thing we have specific reference to in the record is the four inch bronze. Is that correct? Yes, Your Honor. I believe so. Okay. And if you've made – I don't want to take advantage of you here standing up arguing orally because some things go by too fast. If there are specific mentions of small things, feel free to supplement your argument by a letter brief to the court. And if you do such – if you do do that, the other side should feel free to respond. Thank you, Your Honor. I'm not requiring you, but I'm giving you the option. Thank you, Your Honor. Thank you. One minute. Thank you, Your Honor. The burden is on the government in this case. And the question you asked, what is in Yulie Whitehorn's head or Ms. Whitehorn's head, first of all, she said, don't mess anything up. But under canon, this court can consider the after fact objection to a search that the search was not within the scope of the consent given. And I think that's particularly relevant here because when the search of her purse occurred, Ms. Whitehorn was not aware of it. She was in room 291, separated from room 293. And it was not until after the search had been conducted that she was informed of the search. Did she move into the other room voluntarily? No. She was moved into the room for what Officer Baumann and Sergeant Comb testified to as officer safety reasons because there was knives on a room service platter. So they were moved into that room. Officer Baumann actually stood in front of the door. Do you have any evidence as to whether those were butter knives or steak knives? He said they were knives, Your Honor. So we don't know what kind of knives they were? We don't know. Okay. And my time is up. I want to thank you. Okay. Thank you very much. Thank both sides for their helpful argument in the case of the United States v. Whitehorn. That's now submitted for decision. The next case is...
judges: Alarcon, W. Fletcher, Rawlinson